# IN THE COURT OF CHANCERY OF THE STATE OF DELAWARE

| | | |
|---|---|---|
| RICHARD J. KORN, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) C.A. No. 8266-VCG | |
| | ) | |
| SYLVIA KORN, | ) | |
| | ) | |
| Defendant. | ) | |

## MEMORANDUM OPINION

Date Submitted: January 30, 2015
Date Decided: April 22, 2015

Richard J. Korn, *Pro Se Plaintiff*.

David J. Ferry, Jr. and Brian J. Ferry, of FERRY JOSEPH, P.A., Wilmington, Delaware; OF COUNSEL: Ronald D. Ashby, of RONALD DAVID ASHBY & ASSOCIATES, P.C., Media, Pennsylvania, *Attorneys for Defendant Sylvia Korn*.

**GLASSCOCK, Vice Chancellor**

It is hard to imagine equitable litigation more unpleasant than a dispute—over money and property—between a middle-aged child and his nonagenarian mother. In this lawsuit between son—the Plaintiff, Richard J. Korn ("Richard")[1]—and mother—the Defendant, Sylvia Korn ("Mrs. Korn")—I must determine the parties' ownership rights in regard to certain real and personal property, specifically: (1) $200,000 in cash transferred from Mrs. Korn to Richard in 2007; (2) eight cemetery plots at Beth Emeth Memorial Park in Wilmington, Delaware; (3) a condominium, Unit 4-E, Building B, in Coffee Run Condominium, located at 614 Loveville Rd., Hockessin, Delaware 19707 (the "Condominium"), in which the elderly Mrs. Korn previously resided and for which Richard initially sought a partition sale;[2] and (4) the past and residual assets of a joint Morgan Stanley bank account (the "Joint Account") (together, the "Assets"). Generally, Richard argues, and Mrs. Korn denies, that Mrs. Korn made gifts of the Assets to him. Those issues turn on whether, as of the time of delivery, Mrs. Korn possessed the donative intent necessary to make an irrevocable gift to Richard of the Assets. That, in turn, rests largely on the self-interested testimony of the two principals;

---

[1] I refer to Richard and his sister Naomi Syken ("Naomi") by their first names to avoid confusion with their parents, Mr. and Mrs. Korn. No disrespect is intended.

[2] Mrs. Korn resided in the Condominium when Richard initiated this lawsuit, but has since been moved into an assisted living facility due to health complications. Richard has withdrawn his petition for partition.

thus, the burden of proof assumes importance here. This post-trial Memorandum Opinion sets forth my findings of fact and law in that regard.

## I. BACKGROUND FACTS

### A. *The Korn Family*

Mrs. Korn is 95 years old. She and her late husband, Phillip Korn ("Mr. Korn"), moved to Delaware and purchased the Condominium in 1977. Mr. and Mrs. Korn had two children—a son, Richard, and a daughter, Naomi. Mr. Korn, a successful lawyer in New York during his time, passed away in 2004, leaving Mrs. Korn an estate that, while not opulent, was sufficient for her remaining needs, including the Condominium and a Morgan Stanley investment account with holdings of over $1 million.

Richard has largely made his career in politics. Although he received a law degree from Hofstra Law School in 1978 and appeared *pro se* in this matter, he is not a practicing attorney. Over the past two decades, Richard has regularly relied on his parents for financial assistance to support his political career and family. With the passing of Mr. Korn, Richard became very close to his mother, visiting Mrs. Korn in her home several times per week and calling her on the telephone multiple times per day. Also during that time, Richard has been estranged from his sister, Naomi. For reasons not pertinent here, that family dynamic has changed in

part; Richard is now divorced from his wife and no longer close to his mother, who is now close to Naomi.

*B. Transfer of the Assets from Mrs. Korn to Richard*

In November 2007, Mrs. Korn provided Richard with $200,000, which she obtained as a margin loan on her Morgan Stanley investment account, so that Richard could close on the purchase of a house in Wilmington. Neither Mrs. Korn nor Richard prepared paperwork to accompany the $200,000 transfer. Mrs. Korn testified that she had discussions with Richard following the transfer regarding his obligation to repay the $200,000, but Richard denies ever promising to repay the money. Richard notes that his mother once made a gift of money to Naomi so that Naomi could purchase her first house.

In early 2010, around the time of her 90th birthday, according to Mrs. Korn, she and Richard decided that Richard would take a more active role in helping Mrs. Korn manage her affairs. During this same period, Mrs. Korn took several steps in quick succession affecting the disposition of her assets, which at the time consisted mainly of the Condominium and her Morgan Stanley investment account.

On March 2, 2010, Mrs. Korn executed a will devising her estate in equal parts to her son and daughter, Richard and Naomi, pursuant to Mr. and Mrs.

Korn's wishes that each child "get half of whatever would be left."[3]  On March 6, only days after Mrs. Korn executed the will, however, she purportedly sent two letters to her attorney, both in reference to her children's potential inheritance.

In the first letter, Mrs. Korn requests several revisions directly to her will, all having the effect of reducing Naomi's share and increasing Richard's share.  It is unclear from the record whether these revisions were ever executed.

In the second letter, Mrs. Korn requests that Mr. Korn's name be removed from the deed to the Condominium, and that Richard's name be added.  A revised deed drafted in response to this request and conveying the Condominium from Mrs. Korn as sole owner to Mrs. Korn and Richard as "joint tenants with the right of survivorship" was executed on March 25, 2010.

Meanwhile, on March 9, 2010, Mrs. Korn wrote a check to Richard in the amount of $4,000[4] and directed Richard to use it to purchase eight cemetery plots at Beth Emeth Memorial Park in Wilmington, Delaware: three to allow for the re-interment of Mrs. Korn's husband, mother, and brother; one for Mrs. Korn herself; and four for Richard and his then-wife and children.  Richard purchased the eight plots as requested on March 10, placing the deed to the plots in his own name.

---

[3] Def.'s Ex. 27, at 16:19–23.

[4] For the sake of clarity, I note that Mrs. Korn wrote the check from a Bank of America account owned jointly by Mrs. Korn and Richard, which is not the same Morgan Stanley joint bank account that is a focus of this litigation.

On April 19, 2010, Mrs. Korn closed her individual investment account at Morgan Stanley and used the proceeds—approximately $1,187,000—to open a new investment account at the same bank in both her and Richard's names, the Joint Account. A letter dated April 15, 2010, purportedly written by Mrs. Korn but addressed to no one in particular, supposedly indicates that Mrs. Korn created the Joint Account after being upset by a letter she received from Naomi in which Naomi spoke ill of Richard:

> After reading her letter—I haven't slept or eaten. I have decided today to have Richard added to my Morgan Stanley Brokerage account *so that when I pass on, the account will pass to him.*
> [T]he final straw is this letter my daughter sent me filled with lies and more lies, just showing her mental illness and sickness and I will not have my son's reputation or his family smeared or hurt by anything she says or her daughters say . . . .[5]

The only bank paperwork in the record regarding the creation of the Joint Account is a direct deposit authorization and a form authorizing the bank to transfer the funds from Mrs. Korn's individual investment account to the new account, both of which are signed by Richard and Mrs. Korn and state the name of the new account as "Sylvia Korn [and] Richard J. Korn JTWROS;"[6] these forms do not otherwise explain the parties' rights in connection with the Joint Account.

---

[5] Pl.'s Ex. 13 (emphasis added).
[6] Def.'s Ex. 13.

Following the creation of the Joint Account, Mrs. Korn continued to make gifts to Richard by writing checks to him.[7] At the same time, however, over a period of nearly two years, Richard paid himself hundreds of thousands of dollars from the assets of the Joint Account, by using his position as a joint holder to write himself checks. The record reflects that Richard wrote over twenty checks from the Joint Account to himself (or entities connected with him) from September 2010 to July 2012, totaling approximately $600,000, as well as received an additional $50,000 transfer in November 2011. Mrs. Korn did not write or sign any of these checks. Her testimony reflects that she received monthly statements of account activity from Morgan Stanley and would occasionally review the statements with Richard, although she denies speaking with him about the withdrawals in question or being aware of these withdrawals.

Meanwhile, in April 2012, Richard sold the Wilmington house, *i.e.*, the house he purchased in 2007 with the help of $200,000 from Mrs. Korn.[8] Days after the sale, Richard deposited part of the sale proceeds—approximately $70,000—into the Joint Account.

---

[7] *See* Pl.'s Closing Arg. Letter ¶ 11 ("[Richard] offered inconvertible evidence that [Mrs. Korn] gave [Richard] significant financial amounts of money over a number of years. Plaintiff Trial Exhibit # 1 copies of thirty-four (34) checks totaling $187,300.00 given to [Richard] by [Mrs. Korn] from August of 1997 *through May of 2012*." (emphasis added)); Pl.'s Ex. 1 (including fourteen checks written to Richard by Mrs. Korn from July 2010 to April 2012 totaling $71,000).
[8] *See* Def.'s Ex. 3.

In August 2012, Mrs. Korn contacted Morgan Stanley and had the Joint Account frozen, purportedly because she learned for the first time the extent to which Richard was depleting the account funds. By the time Mrs. Korn froze the Joint Account, its assets had dropped to approximately $303,000. Richard asserts that he attempted to resolve his dispute with Mrs. Korn regarding the frozen account for six months, including asking Mrs. Korn to allow him to withdraw $195,000 he alleges he was previously forced to deposit into the Joint Account to avoid a margin call when the account's stock dropped in value, but to no avail.

On January 25, 2013, Richard sent Mrs. Korn an angry letter asserting that he had not stolen any money from Mrs. Korn and that he would never let her be buried in one of the eight cemetery plots that Mrs. Korn asked Richard to purchase for their family. On January 31, 2013, Richard filed this action against his mother.

*C. Procedural History*

Richard's original Verified Complaint requested (1) a partition sale of the Condominium and (2) a declaration that Richard is entitled to $195,000 reimbursement of his cash contributions to the Joint Account, and half the remaining balance of that account. Mrs. Korn counterclaimed against Richard on March 11, 2013, seeking (1) rescission of the deeds granting Richard an interest in the Condominium and cemetery plots and (2) accounting of and a constructive trust upon funds Richard took from the Joint Account. Following the initiation of

7

this action, Mrs. Korn also conducted a straw-man transaction to voluntarily destroy the joint tenancy in the Condominium.

On December 18, 2013, Mrs. Korn filed a Motion for Interim Relief, asking the Court to close the Joint Account, pay off any liabilities, and transfer the proceeds to an interest-bearing escrow savings account, which Mrs. Korn argued was necessary to prevent the value of the Joint Account from decreasing any further as a result of accruing interest on margin loans Richard had made against the account and the volatility of the account's stock. Following oral argument on the Motion for Interim Relief on January 27, 2014, I entered an order granting the Motion on February 19, 2014.

On February 20, 2014, I entered an order bifurcating the issues to be tried; that Order explained that

> the Court shall hold a hearing limited to the determination of what the parties' rights are concerning the Morgan Stanley account, the condominium, and the cemetery lots and rule as to whether the ownership of these assets were for convenience of the defendant/counterclaimant or if the transactions were done with donative intent. After the conclusion of the hearing on the question of ownership of the assets, the Court will, if necessary, schedule a second hearing on the account/constructive trust/monetary damages issue.[9]

On July 15, 2014, I held a one-day hearing on the issue of whether Mrs. Korn intended to make a gift of an interest in the Assets to Richard. Post-trial closing

---

[9] Order of Bifurcation, February 20, 2014.

argument was held on January 16, 2015, after which I requested that the parties submit additional brief memoranda regarding the legal effect of Mrs. Korn's April 15, 2010 letter purporting to describe her reasons for creating the Joint Account. The parties both submitted those memoranda on January 30, 2015.

### D. The Parties' Requests and Contentions

It is notable, given the fact that Richard converted many hundreds of thousands of dollars of his mother's assets to his own use, and in light of her advanced age, what is not at issue in this litigation. Neither party has suggested that Mrs. Korn lacked capacity or acted under undue influence, either in transferring the Assets into Richard's name in 2010, in freezing the Joint Account in 2012, or in engaging in straw-man transfers that, according to Mrs. Korn, altered the Condominium title during the pendency of this litigation.[10] In fact, Mrs. Korn remains strong-willed and mentally acute. The allegations currently before me involve only whether Mrs. Korn transferred the Assets with donative intent.

Over the course of the litigation, the relief requested by Richard has evolved. At closing argument, Richard informed the Court that he is no longer seeking a partition of the Condominium and, in fact, that it was never his intention to displace his mother; rather, the partition action was an idea Richard conceived with his former counsel to use the threat of displacing the very elderly Mrs. Korn from

---

[10] Mrs. Korn does argue, in post-trial briefing, that Richard should be treated as a fiduciary for his mother. That argument is addressed below.

her home as leverage to force her to restore Richard's access to the Joint Account.[11] The full updated relief sought by both Richard and Mrs. Korn is as follows.

### 1. The $200,000 Transfer to Richard

Post-trial, Mrs. Korn seeks a declaration that the $200,000 she transferred Richard in 2007 to aid in the purchase of his home was a loan for which she is entitled to repayment; repayment of this "loan" was not sought in the counterclaim, however. Mrs. Korn contends that Richard approached her about the $200,000 needed for the Wilmington house, and that, though she does not recall whether she discussed this with Richard at the time, she gave the money to him with the intention that it be a loan, not a gift. Mrs. Korn points to Richard's deposit into the Joint Account of $70,000 of the proceeds from when he sold the house in 2012 as part payment towards the $200,000 debt—proof of Mrs. Korn's and Richard's understanding that the money was a loan, not a gift

Richard contends that his mother volunteered the money as a gift, meant to "help him out" as Mr. and Mrs. Korn had previously helped Richard's sister, Naomi, with the purchase of a home. He acknowledges depositing $70,000 into the Joint Account after the sale of the Wilmington house, but claims that he did so

---

[11] *See* Closing Arg. Tr. 11:5–13:11.

to prevent Richard's ex-wife—with whom he was going through a divorce at the time—from having access to the money.

### 2. The Condominium

Mrs. Korn asks the Court to rescind the March 25, 2010 deed that added Richard's name to the Condominium. She contends that she only revised the deed at the behest of Richard, who assured her that placing his name on the deed would enable him to better manage her affairs and that the transfer was merely for "convenience" purposes.

Richard seeks a judicial declaration that his mother made a valid, unconditional gift when she executed the March 25, 2010 deed and that her subsequent straw-man transaction was ineffective in destroying the joint tenancy. Richard contends that his mother intended the inclusion of his name on the deed to be a present gift, and that at no time did he ever pressure Mrs. Korn to put him on the deed to the Condominium or say to her that adding him to the deed would help him manage her affairs.

### 3. The Cemetery Plots

Mrs. Korn asks the Court to rescind the March 19, 2010 deed titling the eight cemetery plots in Richard's name or, in the alternative, impose a constructive trust on the plots for her benefit. She argues simply that Richard purchased the plots at her request with her funds.

11

Richard seeks a judicial declaration that he is the proper owner of the eight cemetery plots. Although he acknowledges that Mrs. Korn directed him to purchase the plots and furnished the money to do so, he contends that he is the outright owner because the money came from a bank account he jointly owned with his mother, he was the actual purchaser, and the deed is in his name. In addition, Richard points out that Mrs. Korn did not object to Richard's name being on the deed to the plots when she viewed it following the purchase.

### 4. The Joint Account

Mrs. Korn asks the Court to declare her the sole owner of the Joint Account proceeds that are now held in escrow, approximately $111,500, and to order an accounting of the money Richard siphoned from the Joint Account. As with the Condominium deed, Mrs. Korn contends that she did not intend to make a present gift to Richard by placing his name on the Joint Account; rather, she argues that she added Richard to the Joint Account, at his behest, for convenience only. As evidence of her lack of intent—besides her own testimony—Mrs. Korn points out that when she became aware that Richard was draining the Joint Account she immediately had it frozen.

12

Richard requests that the Court partition the escrow account containing the proceeds of the Joint Account and distribute half of the proceeds to him.[12] Richard argues that his mother intended to give him the funds in the Joint Account, citing as support the April 10, 2010 letter purportedly drafted by Mrs. Korn. He contends that Mrs. Korn was diligent about reading her monthly Joint Account statements and was therefore aware of all withdrawals he had made; he argues that Mrs. Korn froze the Joint Account not because she suddenly became aware of those withdrawals, as she claims, but because Naomi poisoned Mrs. Korn's mind against Richard as part of the siblings' longstanding feud.[13] Further, Richard highlights many gifts Mrs. Korn gave him throughout the years up until shortly before this action was filed as evidence that she intended to give him full access to the Joint Account. Finally, he argues that his family regularly gave one another large gifts: As noted above, according to Richard, Mrs. Korn had given Richard's sister, Naomi, a down payment on her home; Mrs. Korn had once given Richard two

---

[12] In the Complaint, Richard also asked the Court to declare that Mrs. Korn must repay Richard $195,000, which he alleged to have contributed to the Joint Account. Richard did not develop his claim to the $195,000 at trial or ask the Court for this relief at post-trial argument, and thus I consider the request for $195,000 waived as an affirmative count. Because, as I explain below, I order an accounting of the funds Richard withdrew from the Joint Account, these deposits should be accounted for, to the extent appropriate, in that procedure.

[13] *See* Pl.'s Op. Br. in Supp. of Mot. for Summary J. at 11 ("The filing was necessitated as a direct result and culmination in August 2012 of decades of long, bitter, contentious and outright mean and nasty intra family 'fighting' between [Richard] and his sister, [Naomi] and between [Mrs. Korn] and her daughter, [Naomi]."); *id.* at 16 ("[Naomi] 'convince[d]' [Mrs. Korn] that [Richard] had 'stolen' her money, had financially exploited her and had committed 'Elder Abuse' against her.").

blank checks from one of her individual bank accounts, just in case he ever needed money or anything were to happen to her; Richard had, for a period of time after Mr. Korn's retirement, given his parents $2,000 per month in support; and Richard had once given Naomi's husband money to pay for veterinary school and the family's expenses.

## II. ANALYSIS

### A. *The Legal Standard*

#### 1. Review of the Transactions

Mrs. Korn makes an argument in briefing that she and Richard were in a confidential relationship; that she was dependent and in reliance on him for advice and assistance; and that therefore the Court should consider Richard a fiduciary for his mother and evaluate the transactions accordingly. It is common for the roles of parent and child to reverse at some point, and it is not unusual for a middle-aged son to act in a confidential capacity for an aged parent. Here, however, it is clear to me that such was not the case. Mrs. Korn is elderly, but clearly competent; she is endowed, as demonstrated by her videotape deposition, with a keen intelligence and strong will. She never surrendered control of her finances to Richard, although she probably contemplated the necessity of doing so in the future. There is no indication, despite her litigation-driven arguments to the contrary, that Richard overbore her will; quite the contrary, it was Richard, at all times pertinent not self-

14

supporting, who was forced to be the supplicant to his nonagenarian mother. No basis exists in the record to treat Richard as a fiduciary, and the transactions will be evaluated under the law as it pertains to gifts.

## 2. Gifts and the Presumption of Donative Intent

In order for a gift to be effective under Delaware law, "the donor must possess the requisite donative intent, the property must be properly delivered and the donee must accept the property."[14] The only element at issue here is whether Mrs. Korn possessed the requisite donative intent in transferring interests in the Assets to Richard. Generally, the grantee has the burden to establish donative intent by clear and convincing evidence, a burden that arises out of the rebuttable presumption, often seen in the context of resulting trusts, that a purchaser of property intends that property to inure to her own benefit.[15] However, in the case of transfers between certain family members, including but not limited to transfers from parent to child, the court employs the opposite presumption, that the transfer was intended to be a gift:

> Where the person who supplies the consideration stands towards the grantee in the relation of a parent . . . the authorities are . . . uniform to the effect that the general rule by which a resulting trust would

---

[14] *E.g.*, *Matter of Estate of Smith*, 1986 WL 4873, at \*5 (Del. Ch. Apr. 24, 1986).

[15] *See, e.g.*, *Hudak v. Procek (Hudak I)*, 727 A.2d 841, 843 (Del. 1999) ("Equity presumes, absent contrary evidence that the person supplying the purchase money for property intends that its purchase will inure to his benefit, and the fact that title is in the name of another is for some incidental reason." (internal quotation marks omitted)).

15

otherwise be erected has no application. It is presumed that the intention was to advance the child . . . .[16]

Thus, here the Court will presume that Mrs. Korn intended the transfers in question as gifts to Richard, unless Mrs. Korn demonstrates by clear and convincing evidence that she did not possess such intent.[17] Clear and convincing evidence is "evidence that produces in the mind of the trier of fact an abiding conviction that the truth of the factual contentions is highly probable."[18] In evaluating whether Mrs. Korn has successfully met this standard to rebut the presumption of donative intent, the Court may consider two types of evidence: "First the parties themselves may testify about (or provide other extrinsic evidence of) their intent *at the time of the transaction*. Second, the parties' conduct *after* the transaction, in some cases, may shed light on the parties' contemporaneous understanding of their original agreement."[19]

### B. The $200,000 Transfer to Richard

Although the parties submitted and argued evidence before this Court regarding the 2007 transfer to Richard, Mrs. Korn did not seek repayment of this amount in her Counterclaim. Assuming, however, that this issue is properly before me, I find that Mrs. Korn has failed to rebut the presumption of gift by clear and

---

[16] *Id.* (alterations in original) (quoting *McCafferty v. Finn*, 125 A. 675, 677 (Del. Ch. 1924)).
[17] *See Hudak v. Procek (Hudak II)*, 806 A.2d 140, 147–48 (Del. 2002) ("Although neither this Court in *Hudak I* nor the Court of Chancery on remand explicitly referred to the term, we hold that Procek was required to rebut the presumption of a gift by 'clear and convincing evidence.'").
[18] *Id.* at 147 (internal quotation marks omitted).
[19] *Id.* at 148.

16

convincing evidence. Richard testified that his mother gave him the down payment for the purchase of his house in Wilmington, stating that she wanted to help him out just as she had his sister Naomi; and that the down payment for Naomi's first house from his parents was a gift. Mrs. Korn testified, forcefully, that she would have been "insane" to have made such a gift to Richard, but admits she does not remember telling him that the payment was a loan. The repayment of this "loan" was not sought until late in this very contentious litigation. It is clear that the testimony of both mother and son is self-interested throughout this litigation, and entitled to reduced weight for that reason, and that unfortunately, for reasons not pertinent to my analysis, Mrs. Korn has reasons she may well feel sufficient to harbor ill-will towards Richard.

In addition to her testimony, Mrs. Korn points to the fact that, upon sale of his Wilmington house, Richard deposited $70,000 into the Joint Account. According to Mrs. Korn, this is evidence in acknowledgment of the debt. According to Richard, it was an attempt to put the money beyond the reach of his wife, with whom he was embroiled in a contentious divorce. This is consistent with Richard's conduct in this matter, and I find it plausible.

Considering the totality of the evidence, it falls short of the requisite showing by Mrs. Korn by clear and convincing evidence that she did not have donative intent. Because Mrs. Korn has failed to rebut the presumption of gift with

17

respect to the 2007 down payment transaction, her belated attempt to enforce this "loan" is denied.

### C. The Condominium

Mr. and Mrs. Korn jointly owned the Condominium, with right of survivorship, until his death in 2004.[20] At that point Mrs. Korn became the sole owner, but the paper title continued to list Mr. and Mrs. Korn, jointly. In 2010, Mrs. Korn directed her attorney to transfer title, removing Mr. Korn's name and adding Richard's. According to Richard, this was Mrs. Korn's sole idea. According to Mrs. Korn, Richard asked her to do this as a convenience to her, so that he could help with her affairs, and she did not intend to give Richard a present interest in the Condominium. The problem with the latter assertion is that it is entirely unclear how including Richard on the title would allow such help to Mrs. Korn. Mrs. Korn offers no theory as to why this transfer worked a convenience on her. She simply suggests that Richard told her that such a transfer was necessary, and that she relied on this assertion. Although Mrs. Korn was elderly, this was not a case of an enfeebled parent relying on a child. Mrs. Korn remained capable and sharp-minded. I find unconvincing, therefore, the theory that Mrs. Korn simply accepted Richard's suggestion that she enter a joint tenancy as a convenience to her.

---

[20] The record does not reflect why the couple did not hold the Condominium by the entireties.

Mrs. Korn also points to the fact that she had contemporaneously created a will leaving her estate equally between her children, and argues that transfer of an interest in the Condominium is incompatible with that result. The record, however, indicates that Mrs. Korn's intentions concerning disposition of her estate could rapidly evolve. In any event, nothing in her estate plan is inconsistent with a gift removing a property—or a half-interest in that property—from that estate, by employing a joint tenancy. I find that Mrs. Korn has failed to demonstrate that she intended anything other than what the title indicated: She intended a present gift of an undivided interest in the Condominium.

I next address whether the Condominium title is held jointly with the right of survivorship, or in common. As originally executed, the property was titled jointly, with survivorship. Mrs. Korn argues that this form of ownership was but an unintended artifact: the title had been joint with Mr. Korn, with right of survivorship; she instructed her attorney to add Richard to the title, intending a tenancy in common; and the attorney must have mistakenly simply recreated the previous joint tenancy with right of survivorship, substituting Richard for Mr. Korn. I need not opine on the truth of this assertion, because whatever her intent, Mrs. Korn has, through a straw-man transaction, severed the unities and rendered the title in common. Richard's argument that this latter transaction is void is unavailing. He posits that, having created a joint tenancy with right of

19

survivorship, such a tenancy can only be broken by partition; otherwise, the parties are locked into an irrevocable tontine like scorpions in a bottle, awaiting one another's death. The common law has long recognized a right to sever the unities and create a tenancy in common through sale of one owner's interest, however.[21] Richard and Mrs. Korn are each owners of an undivided half interest in the Condominium, in common.

### D. The Cemetery Plots

Mr. Korn gave Richard funds and directed him to use those funds to purchase the cemetery plots. He did so, acting as her agent. It is abundantly clear that no gift was intended. It is also clear that she contemplated using some of the plots for eventual interment of Richard and his family, but did not have the present intent to make such a gift. Richard has attempted to employ these plots, which he clearly holds for his mother's benefit, to attempt to leverage other, disputed claims which are the subject of this litigation. A constructive trust attaches to the plots in favor of Mrs. Korn, and they must be re-titled in her name.

### E. The Joint Account

Mrs. Korn created the Joint Account in her and Richard's names in April 2010, and she alone funded the account from a previous account containing the

---

[21] *See, e.g.*, *In re Ellingsworth*, 266 A.2d 890, 89 (Del. Ch. 1970) ("It has been held that a severance of a joint tenancy may be accomplished by the act, voluntary or involuntary, or either of the joint tenants."); *Shockley v. Halbig*, 75 A.2d 512 (Del. Ch. 1950) ("One joint tenant can convey his interest and thus destroy the joint tenancy.").

nearly all of her liquid assets. The Joint Account was denominated "Sylvia Korn [and] Richard J. Korn JTWROS"—presumably meaning as joint tenants with the right of survivorship. The record is silent as to how, if at all, the parties' rights in this account were explained by the bank.

As with the Condominium, Mrs. Korn describes the creation of the Joint Account as Richard's idea, so that he could help her with her finances. It is far from uncommon for an elderly parent to add a child's name to an account in order to facilitate such help, without intending a present gift of the account proceeds. The record, as noted above, indicates to me that Mrs. Korn did not want or need such help at the time, although it is certainly reasonable that Mrs. Korn, at ninety years of age, contemplated the need for such help in the near future. Richard insists that Mrs. Korn meant a present gift of the entire Joint Account to him, which she effectuated by placing her money into the account with him jointly, with the intent that he would be a joint tenant with her, with each owning all the funds. Mrs. Korn vehemently denies this intent, credibly in my view asserting that she would not have intended a present gift of up to all her remaining funds.

In light of the parties' self-serving and conflicting testimony, I find important to my determination of Mrs. Korn's intent her letter of April 10, 2010, drafted after she had made a will intended to distribute her estate evenly between her two children. According to the letter, Mrs. Korn was upset with Naomi and

wished to partially disinherit her by creating an account that would pay over to Richard *on her death.* This intent is not inconsistent with an intent that Richard would also be in a position to assist her with her affairs, should that become necessary. It *is* inconsistent, however, with an intent to make an immediate, *inter vivos* gift of her entire estate, leaving her with an undivided interest in the Condominium and her social security income as her only assets. It is not credible to me that Mrs. Korn would make such an impoverishing gift.

This determination is bolstered by the fact that Mrs. Korn continued to make gifts to Richard by writing checks to him after adding him to the Joint Account. If Mrs. Korn had meant to make a present gift of an undivided interest in the entire Joint Account to Richard, it is hard to understand why these gifts—which persisted through May 2012—were necessary. On the other hand, if the funds in the Joint Account remained Mrs. Korn's sole property, these checks make perfect sense. In addition, Richard points to his testimony that Mrs. Korn always told him, when he indicated he needed funds, to "take what he needed." Certainly, Mrs. Korn was always very generous to Richard with her funds, going back many years. Once again, however, asking and receiving permission to take a thing is itself inconsistent with ownership of that thing by the mendicant.

Finally, Richard points out that Mrs. Korn did not complain about his removal of hundreds of thousands of dollars from the Joint Account until she

abruptly froze the account, in August 2012. He argues that she received periodic bank statements; that she must have been aware of the withdrawals; and that her lack of action over two years indicates that she had intended a present gift of the entire Joint Account at the time it was created. I have already noted that Mrs. Korn maintained a keen mind and interest in her own affairs. Nonetheless, given her advanced age and close relationship with Richard, I find her testimony that she did not realize he had removed the lion's share of the Joint Account until shortly before she froze it, credible. I don't find her failure to protest Richard's withdrawals evidence of a gift.

For the reasons stated above, I find that Mrs. Korn has demonstrated by clear and convincing evidence that she did not intend to make a gift of the contents of the Joint Account to Richard. Richard's interest in the Joint Account was limited to his ability to use the account on her behalf, as a convenience to her. Mrs. Korn's intent to make a future gift of the Joint Account, if such she had, was not binding on her absent a present intention to make an irrevocable gift together with delivery, which by clear and convincing evidence I find lacking. The contents of the Joint Account were Mrs. Korn's sole property. Any checks written from the account by Mrs. Korn to Richard were gifts. Richard must account for sums he removed from the Joint Account, and the balance of the escrow account belongs to Mrs. Korn.

## III. CONCLUSION

For the reasons stated above, I find that the 2007 transfer from Mrs. Korn to Richard was a gift, that the Condominium is owned by Mrs. Korn and Richard as tenants in common, that the cemetery plots are beneficially owned by Mrs. Korn and must be re-titled in her name, and that Richard must account for sums he removed for his own benefit from the Joint Account. Counsel for Mrs. Korn should submit an appropriate form of order, and the parties should confer and inform me what further proceedings are appropriate in this matter.